**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

RAYMUREZ CHRISTOPHER BROWN,

                Plaintiff,

v.

                                Case No. 20-10192

JOSHUA SCAGLIONE, et al.,

                Defendants.

_____/

**AMENDED OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO ALL DEFENDANTS AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIM[1]**

On August 17, 2018, while holding his two-month-old child, Plaintiff was tased and forcibly arrested by Defendant Westland Police Officers. Plaintiff has asserted 42 U.S.C. § 1983 excessive force claims against Officers Joshua Scaglione and Robert Schurig. Plaintiff also raises a failure to intervene claim against Officers Cale Furney, Andrew Teschendorf, and Anthony Javonavich. Further, Plaintiff has asserted a state law ethnic intimidation claim under Mich. Comp. Laws. § 750.147b against all Defendants. Plaintiff's arrest and preceding events are well documented through dash cam footage and two bystander videos. Defendants have now filed two motions for summary judgment that collectively seek summary judgment on all claims. (ECF Nos. 82, 84.) For the reasons explained below, the court concludes that summary judgment should be granted in favor of Defendants on all asserted federal claims. But, the court

_____

[1] The court amended the opinion to correct a nonmaterial typographical error. The reasoning and holdings of the court have not changed.

will decline to exercise supplemental jurisdiction over the remaining state law ethnic intimidation claim.

## I. BACKGROUND

On August 17, 2018, Defendant Westland Police officers Cale Furney and Andrew Teschendorf were dispatched to the home of Barbara Joann Tackett. (ECF No. 88, PageID.2824.) Tackett reported she had been physically assaulted by her longtime friend Nichole Skidmore and that Skidmore's boyfriend, Plaintiff "Ray" Brown, had repeatedly punched the hood of her car as she tried to drive away from Skidmore's Westland home. (*Id*.) Tackett's statement to the two Officers is captured on a dashcam recording. (Plaintiff's Ex. 2, Furney Dashcam Video 2, ECF No. 88-3.) Tackett recounted that the dispute began when she attempted to retrieve a borrowed roasting pan from Skidmore and that it escalated because Skidmore and Brown "were drinking." (*Id.* at 0:45-2:00.) Tackett also told the Officers that Plaintiff brought four people with him to help attack her vehicle and that Skidmore began choking Tackett when she threatened to call the police. (*Id.*) Tackett stated that she "threw her car in reverse," drove back to her nearby home, and called 911. (*Id.*) Tackett's mother, who was also present at the time of the altercation, contemporaneously corroborated Tackett's version of the events. (*Id.*) Tackett provided both the location of the home (Alberta Street) and a description of both Skidmore and Brown, along with their respective cell phone numbers. (*See id.* at 4:00-4:30 (describing Plaintiff as a "mixed" race black male in his twenties named "Ray Brown" wearing a black shirt and blue jeans).) Tackett also told Officers that the couple was extremely intoxicated and that they had "a newborn baby" in the house. (*Id.* at 8:00-8:15.) Officers Furney and Teschendorf—who "observed minor

redness around [Tackett's] neck" and "scratch marks . . . as well as some handprints

on" the hood of her car—explained to Tackett that the Officers "would go have a chat"

with the couple and likely issue misdemeanor tickets. (*Id.* at 8:15-9:00; ECF No. 82-2,

PageID.2146.)

      When Defendants Furney and Teschendorf arrived at the home on Alberta Street

around 9:00 pm, they "could hear loud music coming from the location and observed

multiple people on the porch." (ECF No. 82-2, PageID.2146.) Plaintiff testified that he

had been hosting a neighborhood barbeque since 2:00 pm. (ECF No. 84-10,

PageID.2558.) Officers immediately made contact with a black male "matching the

description of 'Ray' on the front lawn" who appeared "visibly intoxicated." (ECF No. 82-

2, PageID.2146.) Dashcam audio records the initial encounter. (Defendant Scaglione

Ex. B, Furney In Car Video, ECF No. 82-3 at 0:30-1:10.) Plaintiff was immediately

hostile when approached by Defendants—asking why they were at his house,

demanding that they not stand on his property, and refusing to provide his name. (*Id.*

(Officer: "What's your name;" Plaintiff: "Man, I'm asking you questions you [sic] at my

residence").) Within forty-five seconds of Furney and Teschendorf's arrival, Plaintiff was

already refusing to answer most questions and was screaming over Defendants'

attempts at communication. (*Id.* at 1:10-2:00.) Defendants can be heard on the

recording explaining to Plaintiff, multiple times, that they were at the residence

investigating a reported crime. (*Id.*) Ninety seconds after Furney and Teschendorf's

arrival, Plaintiff is first warned by one of the Officers that he would "go to jail" if "he

continue[d] to run his mouth." (*Id.* at 2:23-2:30.) When Defendant Officers Joshua

Scaglione, Robert Schurig, and Anthony Javonavich arrived on the scene as backup,

Officer Teschendorf located Skidmore and began interviewing her separately in the street while Plaintiff continued splenetically shouting at the other Officers in front of the home as a crowd of bystanders gathered. (*Id.* at 2:25-6:00.)

In addition to dashcam footage, Plaintiff's continued interactions with Defendants, including the eventual taser application and arrest, are also captured in more detail by two separate bystander videos. The first bystander cell phone video caught about two minutes of the altercation between Plaintiff and the Officers from Plaintiff's right side. (*See* Defendant Scaglione Ex. C, Right Side Bystander Video, ECF No. 82-4.) The second bystander video caught the majority of the altercation between Plaintiff and the Officers from Plaintiff's left side. (Defendant Scaglione Ex. D, Left Side Bystander Video, ECF No. 82-5.)

These videos demonstrate that Plaintiff was again warned he would be arrested if he continued his hostile behavior. (Scaglione Ex. B at 5:55-6:03; Scaglione Ex. D at 0:40-0:55 (Scaglione: "You're two seconds away from being arrested;" Plaintiff: "For what?";  Scaglione: "You're drunk in public;" Plaintiff: "Bro I don't even drink. Have you done a breathalyzer on me? Have you done a breathalyzer on me to see if I'm drunk?").) And, when Officer Scaglione instructed a nearby individual—later described as a neighbor—who was holding Plaintiff's two-month-old son to "get the baby out of here," the video shows that Plaintiff reacted aggressively and grabbed the child. (Scaglione Ex. D at 1:00-1:24.) Despite being repeatedly told by a neighbor and Officers to "calm down," Plaintiff continued to yell while holding his crying child against the right side of his chest. (*Id.* (Plaintiff: "That's my son, and he can be exactly where he's at.

Give me my child. . . That's my son, and he ain't got to go nowhere n****r. . . This man just told me to take my child in the house.").)

The recordings show that Officer Furney told Plaintiff that he had "one last chance" to "calm down" before he would be "tak[en] to jail for disorderly person." (*Id.* at 1:43-1:58.) Furney then repeated this warning in quick succession approximately five times as Plaintiff continued shouting at Officers about his property rights. (*Id.*) Finally, Furney can be heard saying, "[y]ou're going to jail for disorderly person if you keep yelling. Okay? *You're going to jail*." (*Id.*; Scaglione Ex. B at 6:55-7:11 (emphasis added).) When Plaintiff moved toward the door of the house, Officers Scaglione, Schurig, and Teschendorf surrounded him, preventing him from moving further toward the front door of the home, and an unidentified Officer can again be heard telling Plaintiff, "you're going to jail, man." (Scaglione Ex. D at 1:58-2:01.)

With Plaintiff now closely surrounded, Officer Scaglione pointed a taser toward the left side of Plaintiff's chest and repeatedly ordered Plaintiff to "give the baby back," but Plaintiff refused. (*Id.*, at 2:00-2:18.) On the dashcam footage, Officer Scaglione can be heard ordering Plaintiff, approximately six times in rapid succession, to let go of the baby, but Plaintiff continued shouting at Officers and did not put down his crying son. (*Id.*; Plaintiff's Ex. 4, Schurig Dash Cam Video, ECF No. 88-5 at 5:18-5:43.) At this point, Officer Teschendorf and Skidmore both joined the circle surrounding Plaintiff. (Scaglione Ex. D at 2:05-2:18.)

A few seconds later, Officer Scaglione deployed the taser into Plaintiff's left chest area (opposite where Plaintiff held the baby) and pulled the trigger for six seconds. (*Id.* at 2:18-2:23; ECF No. 82, PageID.2112; ECF No. 88, PageID.2830; ECF No. 88-6,

PageID.2877.) The taser application caused Plaintiff to release the baby into Officer

Schurig's hands; Schurig immediately passed the baby to Skidmore.[2] (ECF No. 88,

PageID.2831.) After releasing the baby, Plaintiff was taken to the ground by

Defendants, who attempted to handcuff him. (Scaglione Ex. C, Right Side Bystander

Video at 0:08-0:10.) While on the ground, Scaglione again tased Plaintiff, this time in his

left leg, as other Officers attempted to handcuff Plaintiff. (Scaglione Ex. B at 0:15-0:34;

ECF No. 82-14, PageID.2284-85.) Scaglione testified that, although it cannot be clearly

seen on the video, Plaintiff tried to grab the base of his taser in the ensuing struggle, a

factual point that Plaintiff directly contests. (ECF No. 82-6, PageID.2161; ECF No. 91,

PageID.2922.) The video does show that Officer Schurig struck Plaintiff in the upper

body approximately ten seconds after Plaintiff was taken to the ground. (Scaglione Ex.

C at 0:18-0:22; ECF No. 84-7, PageID.2488.) Schurig testified in his deposition that he

delivered one knee strike to Plaintiff's shoulder area and then struck Plaintiff's left cheek

area once with a closed fist. (ECF No. 84-7, PageID.2481.) Plaintiff testified that, in

addition to these two strikes, another unidentified Officer also punched him in the back.

(ECF No. 84-10, PageID.2574.)

Further, Plaintiff testified in his deposition that he hit his head on a landscape

rock when falling to the ground and only awoke when his hands were already behind his

back. (ECF No. 82-10, PageID.2195 ("At that point, I was unconscious from hitting the

rock. When I was tooken [sic] off of my porch and slammed onto my front lawn, when I

---

[2]     Plaintiff acknowledges that the taser "did not deliver a charge to the baby,
Nichole [Skidmore], or other officers," and that there is no evidence that his son (who
was examined by Westland EMTs as a precautionary measure) suffered any physical
injury as the result of the incident. (*See* ECF No. 88, PageID.2831, 2833.)

awoke, my hands were behind my back.").) The videos appear to contradict this testimony. The right-side bystander videos show Plaintiff was actively flailing, kicking, and pulling his arms under his body for about thirty seconds after he was taken to the ground. (Scaglione Ex. C, at 0:10-0:38.) Plaintiff can also be heard on one of the recordings shouting while on the ground, repeatedly stating that "my hands are behind my back bro," and "I have epilepsy bro." (*See* Plaintiff's Ex. 4, Schurig Dash Cam Video at 5:43-6:22.)

Once Plaintiff was handcuffed, he was returned to a standing position within sixty seconds of being initially taken to the ground. (Scaglione Ex. C, at 0:10-1:08.) And Plaintiff does not allege he was punched or kicked by Officers after he was handcuffed. (*See* ECF No. 88, PageID.2837.) An EMT examined Plaintiff once he was in custody, but the EMT's report indicates that Plaintiff was "irate" and refused care. (*See* ECF No. 82-7, PageID.2166-67.)

Following his arrest, Plaintiff was charged with several misdemeanor violations of Westland's City Ordinances. The case went to trial, and Plaintiff was found guilty by a jury of four misdemeanor violations. These include Disorderly (Intoxicated) Person Sec. 62-97, Resisting Arrest Sec. 62-36(a), Contributing to the Delinquency of a Minor Sec. 62-401, and Disturbing the Peace Sec. 62-99(b).[3] (*Id.*, PageID.2833-34; ECF No. 84-16, PageID.2633.) Plaintiff was acquitted of the other three misdemeanor charges, including malicious destruction of Tackett's property Sec. 62-127, assault and battery on a police officer Sec. 62-67, and hindering a police officer Sec. 62-41. (*Id.*)

---

[3] The applicable Westland ordinance provisions can be found at https://library.municode.com/mi/westland/codes/code_of_ordinances?nodeId=PTIICOO R_CH62OFMIPR_ARTIIOFAGGOFU (last visited July 11, 2022).

As a result of the encounter, Plaintiff alleged in his complaint that he suffered a number of injuries, including concussion symptoms, a right wrist sprain, and a right ankle/knee sprain. (ECF No. 1, PageID.14.) Plaintiff is not asserting a *Monell* claim, and the court previously declined to exercise supplemental jurisdiction over two additional state law claims. (*See* ECF No. 13.) Plaintiff's complaint lists four claims against Defendants that are presently at issue for purposes of summary judgment.

> Count I: 42 U.S.C. § 1983 claim against Defendant Scaglione for excessive force;
>
> Count II: 42 U.S.C. § 1983 claim against Defendant Schurig for excessive force;
>
> Count III: 42 U.S.C. § 1983 claim against Defendants Teschendorf, Furney, and Javonavich for failure to intervene;
>
> Count IV: Ethnic intimidation claim against all Defendants.

(*See* ECF No. 1.)

Discovery in the case is now complete. Officer Scaglione has filed a motion for summary judgment with regards to Counts I & IV (*see* ECF No. 82), while Officers Furney, Javonavich, Robert Schurig, and Teschendorf have filed a joint motion for summary judgment on Counts II through IV (*see* ECF No. 84). The two motions collectively seek summary judgment on all claims remaining in this action.

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no

requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

In the present case, both parties agree that the relevant events were largely captured on dashcam footage and relevant bystander video. While the court draws all reasonable inferences in favor of Plaintiff as the non-moving party, the court need "not accept Plaintiff's facts to the extent that they are 'blatantly contradicted by the record.'" *Mitchell v. Schlabach*, 864 F.3d 416, 418 (6th Cir. 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (citation omitted).

## III. DISCUSSION

All Defendants move for summary judgment on qualified immunity grounds. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In analyzing a party's entitlement to qualified immunity, the Supreme Court has noted: "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Several years later, the Supreme Court further honed its qualified immunity analysis, providing that "judges . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Each Defendant's liability must be assessed individually based on his or her own actions." *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015).

### A. Excessive Force

A claim for excessive use of force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Reasonableness "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* There is a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002).

The reasonableness standard focuses on the specific moment in time the officer made his decision to use force and the information he had at that time. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). It does not consider "whether it was reasonable for the officer 'to create the circumstances'" and "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 915-16 (6th Cir. 2009)). "When, 'as here, a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Hammond v. Cty. of Oakland, Michigan*, 825 F. App'x 344, 346 (6th Cir. 2020) (quoting *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020)).

The Supreme Court in *Graham* "set[] out a three-factor test to aid courts in assessing objective reasonableness." *Graves v. Malone*, 810 F. App'x 414, 421 (6th Cir. 2020). "Those factors are: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396-397).

### 1. Officer Scaglione

The excessive force claim raised against Officer Scaglione is based entirely on his taser usage. (*See* ECF No. 88, PageID.2830.) Officer Scaglione acknowledges he

tased Plaintiff twice, once while he was standing on the porch holding his son and a second time while Officers attempted to handcuff Plaintiff on the ground. (ECF No. 82, PageID.2118 ¶60.) Data downloaded from the taser shows the trigger was pulled for six seconds during its initial use and that it was then pulled for twenty-one seconds during the second activation. (ECF No. 88-6, PageID.2877.) Officer Scaglione moves for summary judgment, arguing that he is entitled to qualified immunity because "[t]he undisputed record demonstrates that Plaintiff was actively resisting arrest when he was initially tasered and continued to actively resist when the taser was reapplied." (ECF No. 82, PageID.2123-24.) Scaglione further argues that Sixth Circuit precedent establishes that it is not excessive force to tase someone who continues to resist arrest. (*Id.* (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015).)

In response, Plaintiff asserts that Officer Scaglione "used objectively unreasonable force against [Plaintiff] by tasing him when he was unarmed, did not pose a threat to others, was not under arrest and was carrying his infant child in his arms." (ECF No. 88, PageID.2841.) Reciting the *Graham* factors, Plaintiff argues that the crime he was being arrested for was not serious, he posed no threat to arresting officers or others, and that he was not actively resisting arrest when Officer Scaglione first tased him. But Plaintiff's interpretation both distorts the record and this circuit's precedent regarding taser usage.

The Sixth Circuit has repeatedly found that "there is no clearly established right not to be tased when a suspect is actively resisting arrest." *Wright*, 962 F.3d at 870 (citations omitted); *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) ("There is no clearly established right for a suspect who 'actively resists' and refuses to

be handcuffed to be free from a Taser application.") (citations omitted); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."). But "there is a clearly established right not to be tased when the suspect is not actively resisting arrest." *Wright*, 962 F.3d at 870 (citing *Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016)).

Plaintiff does not directly contest that Officer Scaglione had probable cause to arrest Plaintiff. Nor can he. As Plaintiff acknowledges, he was ultimately convicted by a state court jury of multiple misdemeanor charges due to his pre-arrest conduct in the front yard that evening. These convictions include disturbing the peace, disorderly person–intoxicated, and contributing to the delinquency or neglect of a minor. (ECF No. 88, PageID.2834 ¶42.)

Officer Scaglione could lawfully arrest Plaintiff for any of these ordinance violations/misdemeanors because they were "committed in [his] presence," *see* Mich. Comp. Laws § 764.15 (1)(a), so in this Circuit, Scaglione is entitled to qualified immunity regarding the initial taser application if the record shows it was (1) "objectively apparent that the Officers intended to take [Plaintiff] into custody" *and* (2) that Plaintiff nevertheless "actively resist[ed]" arrest. *See Goodwin*, 781 F.3d at 325-26. Plaintiff contests both these points, but the video evidence demonstrates that both these conditions were clearly met by the time the taser was applied.

Plaintiff first argues that he "was not told he was under arrest, but rather that he would be arrested if he did not calm down." (ECF No. 88, PageID.2844.) But the undisputed video exhibits show the Officers' intent to arrest Plaintiff was objectively

apparent by the time Plaintiff was tased. Plaintiff was repeatedly warned by Officer

Furney before his arrest that he would be going to jail if he continued his behavior,

culminating in a final statement, "[y]ou're going to jail for disorderly person if you keep

yelling. Okay? *You're going to jail*." (Furney In Car Video Ex. B, ECF No. 82-3 at 6:55-

7:11 (emphasis added).) A few seconds later, an undefined Officer told Plaintiff, "you're

going to jail, man." (Left Bystander Video, Scaglione Ex. D, ECF No. 82-5 at 1:58-2:01.)

And Plaintiff's own statement of facts in his response brief explicitly concedes that

Plaintiff "was told he was *going* to go to jail for disorderly person" before the taser was

applied. (ECF No. 88, PageID.2836 ¶55.) As Officers closely surrounded Plaintiff to

effectuate the arrest, he continued yelling and refused the officers' commands to let go

of the child he had grabbed from a bystander. (Scaglione Ex. D at 1:10-1:20 (Officer:

"Get the baby out of here"; Plaintiff: "This is my son he ain't got to go nowhere. . .").) By

aiming his taser directly at Plaintiff and ordering Plaintiff to let go of the child, Officer

Scaglione reinforced that Plaintiff was now under arrest.[4] (*Id.* at 1:55-2:15.) Despite this

command, Plaintiff continued yelling at Officers and holding his child, who was clearly

distraught and crying loudly.[5] (*Id.*) At this point, the court finds that a reasonable person

---

[4]     While Plaintiff was not verbally warned that he would be tased if he continued to
resist arrest, the court finds that any objectively reasonable person would comprehend
that the pointing of the taser, combined with the Defendants' repeated commands,
carried the implicit threat that continued resistance could result in Scaglione using his
taser. The court is aware of no case law clearly establishing that a suspect must be
given an explicit verbal warning before a taser can be used. *See Jarvela, v. Washtenaw
Cty*, --- F.4th ----, 2022 WL 2901128, at *3 (6th Cir. July 22, 2022) (citing *Matthews v.
Jones*, 35 F.3d 1046, 1048 (6th Cir. 1994) (observing that verbal warnings telling a
suspect to surrender carried an implicit "threat: that, if [the suspect] did not surrender,
the officer would unleash the [police] dog altogether")).
[5]     Officer Scaglione also testified that he observed Plaintiff squeezing his child
tighter and tighter during the interaction and that "the baby was screaming louder and
louder" (*see* ECF No. 82-6, PageID.2160), a fact that Plaintiff denied in his testimony.

would have realized he was under arrest—the fact that Plaintiff was told he was "going to jail" as opposed to under arrest is a distinction without a difference—yet Plaintiff continued shouting and did not release the child.

Next, the court finds that the undisputed video evidence shows that Plaintiff's engaged in *active* resistance immediately before his arrest, justifying the initial taser application. The Sixth Circuit has noted that "[a]ctive resistance to an officer's command . . . legitimiz[ing] an officer's use of a [t]aser . . . can take the form of 'verbal hostility' or 'a deliberate act of defiance.'" *Goodwin*, 781 F.3d at 323 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013); *see also Shanaberg v. Licking Cty., Ohio*, 936 F.3d 453, 459 (6th Cir. 2019) (Nalbandian, J., concurring) (quoting *Eldridge*, 533 F. App'x. at 534-35) ("When noncompliance is paired with a 'verbal showing of hostility,' this combination can amount to active resistance, justifying the use of a taser."). It is apparent from the various videos that Plaintiff failed to comply with Officer Scaglione's commands, repeated at least six times, to release his crying child. Plaintiff's act of noncompliance here, which could reasonably be viewed as using the two-month-old child to prevent arrest, is likely on its own sufficient to justify Officer Scaglione's use of a taser, given that Plaintiff's actions also created a substantial risk of injury to the child.

But the court also finds that Plaintiff's statements to Defendants immediately before his arrest would constitute verbal hostilities that, when combined with his noncompliance, certainly rises to the level of "active resistance." As the court has

But putting aside the disputed squeezing allegation, for the purposes of summary judgment, the videos alone clearly demonstrate that Plaintiff was actively resisting arrest.

15

already recounted in the statement of facts, Plaintiff swore at Defendants and screamed over their commands immediately before his arrest. Plaintiff's drunken behavior falls well within the gamut of "verbally hostile" conduct that can justify an officer's taser. *See*, *e.g.*, *Hall v. Huffman*, No. 3:14-CV-02532, 2017 WL 1409971, at *3, *5 (N.D. Ohio Apr. 20, 2017) (holding that a plaintiff's repeated profanity-laced statements to officers including "shut the fuck up and leave me alone," "you drama son of a bitch," and "shoot me you motherfucker! Are you stupid?" when combined with his noncompliance constituted "active resistance").

The objective reasonableness of Officer Scaglione's conduct is further bolstered by Plaintiff's misdemeanor conviction for resisting arrest. After viewing essentially the same video evidence at trial, the state jury's concluded that Plaintiff resisted arrest, a finding that validates Scaglione's decision-making.[6] (*See* ECF No. 84-16, PageID.2633.) In sum, case law does not clearly establish that Officer Scaglione's first taser application was excessive in view of Plaintiff's behavior. And Plaintiff has failed to "identify a single case predating the conduct at issue that prohibits" taser usage in "a materially similar context," so at minimum, Officer Scaglione did not have "fair notice"

---

[6]   Officer Scaglione also argues that Plaintiff's excessive force claim is barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). (*See* ECF No. 82, PageID.2130 ("[B]ecause the lawfulness of the use of force is a defense to the crime of hindering, resisting, and obstructing an arrest, Plaintiff's Fourth Amendment excessive force claim is barred [by his excessive force conviction]"). However, given the court's holding that Plaintiff's excessive force claim against Scaglione cannot survive an ordinary qualified immunity analysis, the court declines to consider this argument which would require a novel statutory analysis of Westland's ordinance under which Plaintiff was convicted. *See Ruemenapp v. Oscoda Twp., Mich.*, 739 F. App'x 804, 810 (6th Cir. 2018) ("explain[ing] that the *Heck* doctrine applies only where a § 1983 claim would 'necessarily' imply the invalidity of a conviction" and declining to apply it to an obstruction conviction under Michigan Compiled Laws § 750.81d) (quotation omitted).

that the child's location made the initial tasing unlawful. *See Lyons v. City of Xenia*, 417

F.3d 565, 579 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004)).

Nor can Plaintiff show that Scaglione's second, longer taser application while

Officers tried to handcuff Plaintiff on the front lawn was excessive, given clear evidence

of Plaintiff's continued resistance contained in the record. The second taser application

must be analyzed for resistance as a separate "distinct period[] of possible resistance."

*See Goodwin,* 781 F.3d at 323. "The constitutional analysis of the second period of

possible resistance turns on whether [Plaintiff] had ceased resisting as Officer

[Scaglione] administered" another taser shock as Officers attempted to handcuff Plaintiff

on the ground. *Id.* at 326. Again, active resistance includes "physically struggling with,

threatening, or disobeying officers," *see Cockrell v. City of Cincinnati*, 468 F. App'x 491,

495 (6th Cir. 2012), but does not include being "compliant or hav[ing] stopped resisting,"

*see Hagans v. Franklin Cty. Sheriff's Office,* 695 F.3d 505, 509 (6th Cir. 2012).

Plaintiff argues that "the use of a taser is considered a higher level of force than

physical hands-on contact," so if "the objective of using physical force was to arrest"

Plaintiff, then Defendants should have relied only on the "strike techniques and tactics"

employed by Officer Schurig. (ECF No. 88, PageID.2847.) But Plaintiff cites no case law

supporting the proposition that Officers must default to "strike techniques" to subdue a

suspect resisting arrest, and the Sixth Circuit has "firmly establish[ed] that it is not

excessive force for the police to tase someone (even multiple times) when the person is

actively resisting arrest." *Rudlaff*, 791 F.3d at 641 (citing *Hagans*, 695 F.3d at 509

(collecting cases)); *see also Williams v. Sandel,* 433 F. App'x. 353, 363 (6th Cir. 2011)

(finding that it was not excessive force to tase a suspect thirty-seven times, and use

batons and pepper spray, because he continued actively resisting arrest). Here, video evidence demonstrates that Plaintiff was still physically resisting the Officers' attempts at handcuffing him once he was on the ground. When Plaintiff fell to the ground, bystander video shows Officers unsuccessfully grabbing for Plaintiff's arms, and an Officer can be heard yelling: "stop resisting." (Scaglione Ex. C at 0:17-0:21) After approximately ten seconds on the ground, the video shows Plaintiff shoving or striking Officer Schurig in the upper body with enough force that he is pushed up and away from Plaintiff. (*Id.*) Although it cannot be definitively observed on the video, Scaglione also testified that, in the melee, Plaintiff also tried to grab the base on his taser (*see* ECF No. 82-6, PageID.2161), a point Plaintiff disputes. But even if Plaintiff did not grab the taser, the bystander video *does* clearly show Plaintiff continued struggling and attempting to kick Scaglione as he deployed the taser. (*See* Scaglione Ex. C at 0:30-34.) Plaintiff testified that he did not resist arrest because he hit his head on a landscape rock when falling to the ground and only awoke when his hands were already behind his back (*see* ECF No. 82-10, PageID.2195), but the court will not credit such testimony as it is blatantly contradicted by the video. *See Scott*, 550 U.S. at 380. Because the bystander video irrefutably demonstrates that Plaintiff continued to resist arrest, the court finds both "that no constitutional violation occurred" when Scaglione deployed his taser a second time and that the "right not to be tased while resisting arrest [is] not clearly established" in this scenario. *See Cockrell*, 468 F. App'x at 495.

### 2. Officer Schurig

Plaintiff also claims Officer Schurig employed excessive force "by striking [Plaintiff's] back with his knee and striking [Plaintiff] in the face with a closed fist, while

[Plaintiff] was on the ground, and had his hands behind his back." (ECF No. 91, PageID.2927.) Because Plaintiff alleges only that Schurig used excessive force while Plaintiff was on the ground, the analysis of Count II must focus on the sixty seconds between the initial takedown and when Plaintiff was handcuffed and returned to his feet. Considering the *Graham* factors and the relevant case law, the court finds that Officer Schurig's decision to strike Plaintiff was not objectively unreasonable and thus did not violate the Fourth Amendment.

Plaintiff is correct when he asserts that the severity of the misdemeanor crimes for which he was arrested, including public intoxication, disorderly conduct, and contributing to the delinquency of a minor are not especially serious. *See Smith v. Ray,* 781 F.3d 95, 102 (4th Cir. 2015) (finding that "the misdemeanor of contributing to the delinquency of a minor" is not a serious offense); *Faulkner v. Mattina,* No. 3:11-CV-250-KKC, 2014 WL 201463, at *7 (E.D. Tenn. Jan. 17, 2014) ("Public intoxication and disorderly conduct are not severe crimes."). But the court finds this factor is outweighed by the other two *Graham* factors, which weigh in favor of the objective reasonableness of Schurig's use of force.

By the time Defendants employed physical force to arrest Plaintiff, the court finds that he posed an immediate threat to the safety of both officers and others. *See Graham,* 490 U.S. at 396. Plaintiff undeniably escalated the situation that evening when he grabbed his crying two-month-old child while continuing to shout aggressively.[7]

---

[7]     Plaintiff's response brief repeatedly argues that it was the Defendants who needlessly "escalated the encounter" by speaking to Plaintiff in a "degrading and demeaning" manner when they first encountered Plaintiff. (ECF No. 91, PageID.2928 ("[Officers] refused to explain why they were on his property and repeatedly called him derogatory names such as 'homie,' and 'homeboy,' and used profanity by calling him a

Given Plaintiff's intoxicated and agitated state, as unmistakably demonstrated in the recordings, any reasonable policeman would have concluded that leaving the child in Plaintiff's arms posed a risk of injury to the child. *See, e.g.*, *Wilson v. Flynn,* 429 F.3d 465, 468 (4th Cir. 2005) (finding that a suspect "posed a threat to the safety of his wife [and] children" under *Graham* because the suspect "had been drinking[,] . . . t[ore] up the house, and . . . disable[d] the car his wife had been driving to prevent her from leaving"). Simply leaving a baby in the hands of an individual displaying such behaviors certainly poses a risk to the child, but from Defendants' perspective, the threat was further heightened because they also observed Plaintiff "squeez[ing] the child harder and harder." (ECF No. 82-6, PageID.2159.) Furthermore, the fact that Plaintiff had never been patted down for weapons combined with his aggressive behavior meant that Plaintiff posed at least a limited threat to Defendant themselves. Consequently, the second *Graham* factor weighs in favor of Officer Schurig's use of force to arrest Plaintiff.

Plaintiff's continued physical resistance to Defendants' attempts at taking him into custody here weighs heavily in favor of Officer Schurig's use of force. Plaintiff argues it was "objectively unreasonable to kick and strike with a closed fist an unarmed, nonviolent man, who was surrounded by four officers and posed no threat to himself or the officers." (ECF No. 91, PageID.2929-30.) While Plaintiff acknowledges he can be "seen flailing on the ground" in the bystander video, he argues that a genuine factual

---

jackass escalating the encounter.").) But the Sixth Circuit has explicitly rejected the idea that defendants can "be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force." *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (finding that "the proper approach" is to "first identify the 'seizure' at issue here and then examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances") (quotation omitted).

dispute exists because a witness heard on the video stated that Plaintiff had his hands behind his back when Officer Schurig punched him. (*Id.*, PageID.2930-31.) Further, Plaintiff points out that he can be heard making similar statements at points while on the ground. (*Id.*) The problem with Plaintiff's argument is that actions (especially those recorded on video) speak louder than words. As the court has previously recounted, at approximately eighteen seconds into the right-side bystander video, after Plaintiff had already been taken to the ground, Plaintiff can be seen striking or shoving Officer Schurig forcing him up and away from Plaintiff's body. (Scaglione Ex. C, at 0:10-0:38.) Approximately two seconds later, when Officer Schurig strikes Plaintiff in the upper body, the bystander can be heard exclaiming, "hands behind his back they [sic] punching him." (*Id.*) As the bystander makes a similar statement, approximately fifteen seconds later, Plaintiff can be seen on the video failing and kicking Officer Scaglione in his left side. (*See id.* at 0:30-35) Again, the video undisputedly demonstrates that Plaintiff was actively resisting throughout the very short period of time that Officer Schurig delivered his blows. The court is not required to credit any inaccurate contemporaneous commentary by either the Plaintiff himself or a bystander that clearly contradicts what can be seen on the video. *See Mitchell*, 864 F.3d at 418. Nor should the court do so where, as here, the non-movant's account of the facts is completely at odds with the record.

Considering the totality of the circumstances, undisputed evidence establishes that Officer Schurig's relatively limited use of physical force against Plaintiff was objectively reasonable because Plaintiff was actively resisting arrest. Indeed, courts in this Circuit have repeatedly found that physical strikes, including close-fisted punches,

are not objectively unreasonable in similar circumstances. *See*, *e.g.*, *Brax v. City of Grand Rapids*, 742 F. App'x 952, 957 (6th Cir. 2008) (holding that defendant officer's "split-second judgment that a single punch was necessary to subdue a drunk, strong, and resisting young [suspect]" did not violate the Fourth Amendment); *Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005) (finding that a blow that broke a plaintiff's jaw was not objectively unreasonable, where the "apparently intoxicated," plaintiff who "was not charged with a serious crime . . . attempt[ed] an escape from the holding area of the police station"); *Bland v. Wagner*, No. 1:19-CV-297, 2021 WL 311375, at *6 (W.D. Mich. Jan. 4, 2021), *report and recommendation adopted*, ("[I]n the instant case, it cannot be said that Defendants' use of force on Plaintiff, including Defendant Wagner's punches to Plaintiff's face resulting in Plaintiff's loss of teeth, was objectively unreasonable where Plaintiff fought Defendants' attempts to handcuff him and made it clear to the officers that they would have to use force to control him."). And even Plaintiff's own summary judgment briefing implicitly concedes that Officer Schurig's use of force was reasonable when he argues that Defendants should have relied on Officer's Schurig physical strikes to subdue Plaintiff in lieu of a second taser application. (*See* ECF No. 88, PageID.2847.)

## B. Failure to Intervene

Defendants also contend that they are entitled to summary judgment on Plaintiff's claims for failure to intervene asserted against Officers Furney, Teschendorf, and Javonavich. To establish liability for failure to intervene in another officer's excessive use of force, the plaintiff must demonstrate that "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both

22

the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Mere presence during an altercation is insufficient to establish liability—the plaintiff must make some showing of "direct responsibility." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). Applying this test, the court finds that Plaintiff has failed to establish a viable claim against any of the Defendant Officers that can survive summary judgment for two independent reasons.

First, the court has already found that Officers Scaglione and Schurig did not violate Plaintiff's constitutional rights by using excessive force. Plaintiff cannot pursue a failure to intervene claim in the absence of an underlying constitutional violation. *See Craft v. Billingslea*, 459 F. Supp. 3d 890, 912 (E.D. Mich. 2020) (Drain, J.) ("[A]s there was no constitutional violation, the other officers present cannot be held on a failure to intervene claim.").

Second, the court finds that Plaintiff has failed to show that any of the Defendant Officers had "a realistic opportunity to intervene and prevent harm." *Ontha v. Rutherford Cty., Tenn.*, 222 F. App'x. 498, 507 (6th Cir. 2007). Both parties agree that Officer Scaglione never verbally stated he was going to deploy his taser, and it is also undisputed that this initial tasing lasted only six seconds.[8] The Sixth Circuit has held that "an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene to stop such force." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 493 (6th Cir. 2020) (quoting *Alexander v. Carter for*

---

[8]     To be clear, while Officer Scaglione did point the taser at Plaintiff before the initial tasing, Plaintiff does not allege that merely pointing a taser at an uncooperative suspect to effectuate an arrest was itself a use of excessive force. So even under Plaintiff's theory of the case, the other Defendants had no independent duty to intervene to prevent Officer Scaglione from merely pointing the taser at Plaintiff.

*Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018)) (internal quotation marks omitted). So, the court finds that the "fleeting" nature of "the [first] tasing den[ied]" Furney, Teschendorf, and Javonavich "the opportunity to intervene and prevent any harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013).

And during the sixty seconds Plaintiff was on the ground, the bystander videos demonstrate that neither Furney, Teschendorf, nor Javonavich would have had a meaningful opportunity to intervene and prevent Scaglione and Schurig from additional fleeting applications of force to effectuate the arrest. Furney's deposition testimony that he was engaged in controlling the large crowd that had formed at the scene during the time period at issue is supported by the bystander video, which shows he walked away from the group of Officers surrounding Plaintiff and out of the frame approximately six seconds before the initial taser application. (*See* Scaglione Ex. D at 0:40-0:55.) Likewise, during the second segment, a failure to intervene claim cannot reasonably be sustained against Officers Teschendorf and Javonavich, who were otherwise "preoccupied with attempting to detain" Plaintiff, ensure the safety of Plaintiff's child, and control the forming crowd. *See Wright*, 962 F.3d at 872.

### C. Ethnic Intimidation

Plaintiff has also asserted an ethnic intimidation claim against all Defendants under Michigan law. (*See* ECF No. 1, PageID.19.)  In contrast to the federal claims considered above, which required assessing Defendants' conduct from an objective view, an ethnic intimidation claim requires a finding that Defendants acted "maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin." Mich. Comp. Laws. § 750.147b; *see*

24

*also People v. Schutter*, 265 Mich. App. 423, 428, 695 N.W.2d 360, 362 (2005).

"'[S]pecific intent has been defined as *the subjective* desire or knowledge that the

prohibited result will occur.'" *People v. Gould*, 225 Mich. App. 79, 86, 570 N.W.2d 140,

144 (1997) (quoting *People v. Spry*, 74 Mich. App. 584, 596, 254 N.W.2d 782 (1977))

(emphasis added). So, to adjudicate the pending ethnic intimidation claim, the court

would need to conduct a distinct factual analysis to determine the Defendants'

respective intents.

Because the court has already awarded summary judgment to Defendants on all

federal claims at issue, the court declines to exercise supplemental jurisdiction over the

single remaining state law claim (Count IV). Plaintiff's suit is brought under federal

question jurisdiction. 28 U.S.C. § 1331. (ECF No. 1, PageID.2.) The only basis of

jurisdiction for Plaintiff's state law claim is supplemental jurisdiction under 28 U.S.C. §

1367 because both Plaintiff and Defendants are citizens of Michigan. (*Id.*) A district

court may decline to exercise supplemental jurisdiction when "the district court has

dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

"When all federal claims are dismissed before trial, the balance of considerations

usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal

Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). Only "overwhelming interests in

judicial economy may allow a district court to properly exercise its discretion and decide

a pendent state claim even if the federal claim has been dismissed before trial."

*Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991). Here, the

court has already remanded other state law claims from this suit to Michigan court (*see*

ECF No. 13), so given the distinct factual analysis required to adjudicate the ethnic

intimidation claim, the judicial economy interests with regard to this remaining claim are not "overwhelming." Therefore, the court will also remand Plaintiff's ethnic intimidation claim.

## IV. CONCLUSION

Through undisputed video exhibits, Defendants Scaglione and Schurig have shown that they did not use excessive force in violation of Plaintiff's constitutional rights when they arrested Plaintiff. Furthermore, the court finds that no reasonable jury could conclude that Defendants Furney, Teschendorf, or Javonavich had a duty to intervene at the time of the arrest. Therefore, the court will grant Defendants' summary judgment on all counts brought under federal law. Finally, since all the Federal claims are resolved, the court will decline to exercise jurisdiction over Count IV—a Michigan law ethnic intimidation claim requiring a distinct factual analysis—so the count is dismissed without prejudice. Accordingly,

IT IS ORDERED that Defendant Scaglione's Motion for Summary Judgment (ECF No. 82) is GRANTED.

IT IS ORDERED that Defendants Schurig, Furney, Teschendorf, and Javonavich's Joint Motion for Summary Judgment (ECF No. 84) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's State law ethnic intimidation claim (Count IV) is DISMISSED WITHOUT PREJUDICE.

s/Robert H. Cleland        /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 1, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 1, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                              /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C1 ORDERS\20-10192.BROWN.MSJ.AAB.2.docx